**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| **Plaintiff**, | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | **Case No.:** |
| **MICHAEL AYALA, and WAVEMARK CAPITAL, LLC,** | § | |
| **Defendants.** | § | |

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff") for its Complaint against Michael Ayala ("Ayala") and Wavemark Capital, LLC ("Wavemark") (collectively "Defendants") alleges as follows:

## I. NATURE OF ACTION

1. From approximately October 2021 through February 2025 (the "Relevant Period"), Wavemark and its principal, Ayala, raised approximately $9.6 million from nearly 100 investors through Wavemark Income Fund, LLC ("WIF") by offering securities in the form of promissory notes (the "WIF Investment Offering"). Defendants promised to use investor money to purchase mobile homes and to pay investors guaranteed annualized returns between 12% and 14% through rental payments and sales of the mobile homes. Defendants further promised investors that they would install the newly purchased mobile homes in parks owned by affiliate

entities controlled by Ayala; that they would receive consistent distributions; that WIF had made consistent, uninterrupted payments to investors for over twenty months; and that investors' promissory notes would be secured by the underlying mobile homes and/or the homes' certificates of origin.

2. None of these representations were true. Defendants did not purchase new mobile homes or install them at affiliated companies' sites, but instead used the bulk of investor money to pay for expenses and debts incurred by Ayala's other companies or to make Ponzi-like payments. Defendants had not made, and did not make, consistent distributions to investors, but instead missed payments and misled investors when payments were not made. Investors' investments were also not secured by new mobile homes—indeed, no mobile homes were purchased whatsoever.

3. In June 2025, Wavemark ceased operations and the majority of investors lost all or the majority of their investments.

4. Through their actions, Defendants have violated, and unless enjoined will continue to violate, the antifraud provisions of the federal securities laws as specified below. The Commission brings this action against Defendants seeking: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains from Defendants, plus prejudgment interest; and (iii) a civil penalty against Ayala.

## II.
## DEFENDANTS

5. **Michael Ayala** resides in Austin, Texas. At all relevant times, Ayala has controlled Wavemark and WIF.

6. **Wavemark** is a Wyoming limited liability company with its principal place of

business in Sheridan, Wyoming. It has an office located in Austin, Texas. Ayala is the founder and managing partner of Wavemark. Wavemark claimed to specialize in investments in mobile home parks and served as the manager of WIF. Wavemark has been administratively dissolved since December 9, 2023. Even so, Wavemark's alleged misconduct occurred through at least February 2025.

## III.
## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

8. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

9. Defendants engaged in the acts, omissions, transactions, practices, and/or courses of business described in this Complaint in connection with the offer, purchase, and/or sale of WIF promissory notes, which are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

10. In connection with the conduct described in this Complaint, Defendants, directly and indirectly, made use of means or instrumentalities of interstate commerce, or of the mails by, among other means, soliciting and accepting investments via the Internet, transmitting promissory notes via email, and accepting investor deposits via mail, wire, or other electronic-funds transfer.

11. Venue in this district is proper under Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial part of the events giving rise to the claims occurred within the district, including but not limited to Defendants' sales of securities, misrepresentations, acts, practices, transactions, and courses of business. Further, Ayala resides in Austin, Texas, which is located within this district.

## IV.
## FACTUAL ALLEGATIONS

### A. Defendants solicited investors for a "game changing opportunity" by offering WIF promissory notes.

12. In October 2021, Ayala launched WIF as a "game changing opportunity" to investors in multiple states. He told investors that they must make a minimum investment of $50,000 and promised that Defendants would use investor money to buy new mobile homes directly from manufacturers and set them up in mobile home parks owned by the affiliate entities Ayala controlled.

13. Throughout the Relevant Period, Defendants solicited investors across the United States through multiple channels, including through the internet, Wavemark's website, social media, phone calls, and texts. If a potential investor indicated they were interested in investing with WIF, Defendants provided several offering materials to the prospective investor to purchase promissory notes, including a WIF term sheet and private placement memorandum ("PPM"). These offering materials outlined the key terms of the WIF Investment Offering, including, among other things, an explanation of the purported investment "opportunity"; statements regarding the use of investor proceeds; representations that the promissory notes were secured; and rates of return the investors were promised they would receive.

14. Specifically, Defendants told investors that the investments would pay a guaranteed

rate of return between 12% and 14% depending on the length of the investments (12% for a one-year investment, 14% for a two-year investment). Defendants also represented to investors that WIF generated returns for investors by selling new mobile homes for a profit and collecting lot rents from new homeowners.

15. In exchange for their investment, investors received a "Secured Promissory Note," which outlined the terms of the investment and listed investors' guaranteed rates of return. The WIF promissory notes were offered to the public at large and investors reasonably expected to earn returns based on Defendants' representations regarding the security of the investment and the guaranteed rates of return. Investors also received from Defendants a subscription agreement that documented the amount of their investment and provided WIF's bank account information to the investor. In addition, Defendants provided potential investors with a first lien security agreement. All documents listed Wavemark as the Manager of WIF, and the subscription agreement was executed by Ayala in his capacity as Wavemark's Managing Member.

16. To invest, investors sent money via wire transfer to WIF's bank account, which was owned and controlled by Ayala. Once WIF's bank account received the money, it was pooled and commingled with other investor money.

17. Subsequently, Ayala, or the controller for an affiliate entity at Ayala's direction, transferred investor money to other bank accounts Ayala controlled. Later, some of the money was transferred back to WIF's bank account so WIF could use investor money to pay investors a distribution on their purportedly guaranteed returns. The remainder of the investor money was misappropriated by Ayala for unauthorized purposes, as outlined below.

**B. Defendants made various misrepresentations and omissions to investors in the course of their solicitations.**

18. Ayala reviewed, approved, and had the ultimate authority over WIF's marketing and offering materials that Defendants distributed to prospective investors, including the WIF term sheet, a pitch deck promoting WIF as "a truly passive income investment," and WIF's PPM, which stated the WIF promissory notes were for "investment purposes."

19. Acting under Ayala's direction, Wavemark salespersons promoted the WIF Investment Offering via the Wavemark website, social media, webinars, email, phone, and text. Additionally, Ayala personally solicited potential investors and held virtual meetings with investors to discuss the WIF Investment Offering. Defendants offered and sold the WIF Investment Offering to a broad segment of the public, with investors located in at least five states. Throughout these solicitations, Defendants and their representatives made various material misrepresentations and omissions, including the following:

***a. Defendants misrepresented and otherwise omitted key information about how investor funds would be used.***

20. Defendants represented to investors, both orally and through WIF's marketing and offering materials, that they would use investor money to buy new mobile homes directly from manufacturers for resale and install them in mobile home parks owned by affiliate entities owned by Ayala.

21. These statements were false and misleading. Rather than buying new mobile homes, Defendants misused investor money to make Ponzi-like payments to other WIF investors, pay sales commissions, and pay debts and operational expenses related to Ayala's affiliated businesses. Defendants did not buy any mobile homes with WIF investor money and misrepresented the use of investor money throughout the entire scheme.

22. Defendants also claimed within the PPM provided to investors that they would not pay commissions to those who solicited investors, but Defendants hired at least one salesperson and used WIF investor money to pay him at least $62,000 in undisclosed commissions.

***b. Defendants misrepresented the sources and amounts of expected returns on investments.***

23. Defendants made false and misleading statements about the source of investor returns while promoting the WIF Investment Offering. Defendants represented that investors would receive guaranteed annual returns of 12% or 14% generated through a "two-step strategy": (1) profits from new mobile home sales and (2) rental payments from newly placed mobile homes in parks owned or managed by affiliated entities.

24. Ayala claimed orally and both Ayala and Wavemark claimed within the offering materials that WIF bought new mobile homes for $50,000 – $55,000 per unit and resold them for $75,000 – $80,000 each, with the margin constituting the first component of the return. According to WIF's PPM, investors received a promissory note from WIF with a guaranteed annual return of 12% for a 12-month term or a guaranteed annual return of 14% for a 24-month term. Ayala stated on social media that WIF's two-step strategy produced "revenue streams" ensuring "reliable returns for our investors."

25. In the offering materials and via oral communications, Defendants represented to investors that their WIF Investment Offering was "insulated and secure" thereby allowing investors to receive a fixed income stream shielded from market volatility and recession. Further, Defendants indicated to investors they had an established infrastructure and processes in place, with an experienced management team able to handle all the operation activities, thus allowing investors to reap the benefits.

26. Again, however, these representations were false. Defendants did not have a secure and fixed income stream, nor did they have established processes and infrastructure in place to ensure investor distributions. Returns were also not consistent or guaranteed, because WIF had never purchased assets or generated actual returns. The limited returns paid by the Defendants to investors came from three sources: (1) money received from other WIF investors, (2) rental payments from mobile homes owned by Ayala's affiliated entities, and (3) financing obtained from third-party lenders.

***c. Defendants made misleading statements claiming the investments were secured by the underlying assets or certificates of origin.***

27. During their solicitations to investors, Defendants made false and misleading representations to investors that WIF's promissory notes would be secured by first-priority liens on newly acquired mobile homes. Defendants required investors to sign a secured promissory note and a first lien security agreement, which reiterated these representations. Additionally, Defendants represented they would file a financing statement to perfect the investors' security interest in the new mobile homes.

28. During a July 23, 2024 webinar for prospective WIF investors, Ayala repeated this claim, stating that WIF obtains "a UCC filing" against the mobile homes.

29. Ayala also told investors during a June 2023 webinar and Ayala and Wavemark told investors in certain September 2024 emails that the new mobile homes would be secured by "certificates of origin," which, among other things, identified a mobile home's serial number and manufacturer.

30. Again, however, Defendants did not purchase any mobile homes, nor did they file any UCC financing statements to perfect the investors' security interest or obtain certificates of origin.

Contrary to the Defendants' representations to WIF investors, the WIF promissory notes were not secured by any assets.

***d. Defendants made false claims about payments WIF made to investors.***

31. Beginning in January 2024, Defendants struggled to pay investor returns and began to make payments late or missed them entirely. Despite these payment delays, Defendants falsely assured prospective investors that WIF had no payment disruptions.

32. For example, during a July 2024 webinar, Ayala claimed that WIF had paid investor returns for 21 months consecutively. This statement was false. Beginning in January 2024, Defendants started receiving emails and text messages from investors about overdue distributions and unpaid principal amounts. Ayala gave various excuses for the missed payments. Ayala chose which investors to pay based on available funds and which investors were most upset about their missed distributions. While Defendants paid some purported returns to investors, they failed to pay all investors the promised returns during the Relevant Period.

33. The Wavemark website, active until May 2025, also claimed that WIF had a track record of paying returns for 28 months consecutively. Between January and April 2024, Wavemark salespersons, at Ayala's direction, also misled potential investors by falsely claiming WIF had "never missed a payment," "never missed a distribution," or "not missed a distribution period to our investors." Again, these misrepresentations were false: Defendants had failed to make consistent payments for months at the time these representations were made.

34. In October 2024, Ayala falsely told a potential investor that WIF payment disruptions only happened during the COVID-19 pandemic and that he did not expect any future issues. This statement was false, however, because the payment disruptions did not only happen during the pandemic; they continued, and were due to Defendants' misappropriation of money.

35. Defendants also promised investors in the offering materials that they would immediately repay both principal and unpaid interest in the event of a default caused by WIF's missed payments on the notes. This was yet another false commitment Defendants never honored, and they did not return investor money when investors reported defaults via email and text messages.

**C. Defendants misappropriated investor money.**

36. Despite the representations made in their solicitations, Defendants did not use investor money to purchase mobile homes for resale. Instead, Defendants misused investor money to make $795,485 in Ponzi-like payments and otherwise misappropriated investor money to pay $62,000 in sales commissions and to pay approximately $8.7 million in debts and operational expenses for Ayala's affiliated entities, including payroll, utilities, and distributions to non-WIF investors.

37. At all relevant times, Ayala had sole control over Wavemark and WIF, sole control over WIF's bank account, and had the ultimate authority over the investment materials and deciding how to spend WIF's funds.

38. As a result of the Defendants' misconduct, investors lost the majority of their investment.

## FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

38. Plaintiff re-alleges and incorporates paragraphs 1-38 of this Complaint by reference as if set forth verbatim in this Claim.

39. By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 1-3 and 13-38 above, Defendants, directly or indirectly, in connection with the purchase or sale of

securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

a. employed a device, scheme, or artifice to defraud;

b. made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

40. By reason of the foregoing, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

41. Plaintiff re-alleges and incorporates paragraphs 1-38 of this Complaint by reference as if set forth verbatim in this Claim.

42. By engaging in the acts and conduct alleged herein, and as alleged in paragraphs 1-3 and 13-38 above, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, have:

a. knowingly or with severe recklessness employed a device, scheme, or artifice to defraud;

b. knowingly, with severe recklessness, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. knowingly, with severe recklessness, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

43. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## V.
## JURY TRIAL DEMAND

44. The SEC demands a trial by jury on all issues that may be so tried.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

A. Permanently restraining and enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B. Permanently restraining and enjoining Defendant Ayala from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Ayala from purchasing or selling securities for his own personal account;

C. Ordering Defendants to disgorge, on a joint-and-several basis, all ill-gotten gains they received as a result of the violations alleged herein, together with prejudgment interest on those amounts, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15

U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

D. Ordering Defendant Ayala to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein; and

E. Imposing such other and further relief as the Court may deem just and proper.

Dated: September 21, 2026

Respectfully submitted,

/s/ Keefe Bernstein
Keefe Bernstein
Texas Bar No. 24006939
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone: (817) 900-2607
Facsimile: (817) 978-4927
bernsteink@sec.gov

*Attorney for Plaintiff*